## CIRCUIT COURT OF THE CITY OF RICHMOND

Colonial Mechanical Corp.

v.

Jesson and Frantz
Contractors and Developers, Inc.

December 14, 1990

Case No. LS-2979-2

By JUDGE RANDALL G. JOHNSON

At issue in this case, which is before the court on plaintiff's motion for summary judgment, is the proper interpretation of a payment provision in a contract between a general contractor and subcontractor. The provision, which is contained in Article VI of the contract, provides:

> The Contractor shall make final payment to the Subcontractor within ten days of receipt of final payment from the owner.

The question now before the court is whether that provision creates a condition precedent for payment to the subcontractor or simply establishes a reasonable time for such payment. Stated differently, the question is whether the general contractor is excused from paying the subcontractor if payment is never received from the owner.

The parties agree that the subcontractor has performed all of its duties under the contract and that the value of those services for which he has not been paid is as set out in the motion for judgment. They also agree that the precise issue before the court is one which has never

been addressed by our Supreme Court and that the majority view of other states is that such a provision does not create a condition precedent to payment but merely establishes a reasonable time for payment. Naturally, plaintiff, the subcontractor, urges the court to follow the majority view. Just as naturally, defendant, the general contractor, urges the opposite. Defendant offers two arguments in support of its position.

First, defendant argues that the minority view is simply the better view and that this court, in the absence of guidance from our own Supreme Court, should adopt it. Second, defendant argues that even if the majority view prevails in Virginia, the parties to this particular contract have expressed their intent not to be bound by the majority view here. For the reasons which follow, the court rejects both of defendant's arguments and will enter summary judgment for the plaintiff.

With respect to whether the court should adopt the majority or minority view, the court has located only four cases which even remotely suggest adherence to the minority view, and three of those cases are highly questionable. In *Massoni v. I. B. Miller, Inc.*, 261 N.Y. 1, 184 N.E. 473 (1933), a case generally cited as indicating that New York has adopted the minority view, the trial judge, after allowing parole evidence to help show the parties' intent, held that a contract provision similar to the one at issue here created a condition precedent to payment to the subcontractor. The court of appeals affirmed the trial court, stating "[t]he trial judge, *after receiving parol evidence of the actual intention of the parties*, gave it this construction, and that construction was not erroneous as [a] matter of law." 184 N.E. at 474 (emphasis added).

By contrast, the parties in the case at bar have stipulated that parol evidence would not be helpful to the court here and that the parties' intent must be gleaned solely from the written contract. In fact, even though defendant has not formally moved for summary judgment, counsel for both parties agreed at oral argument that the court must enter summary judgment for one of the parties now since there are no factual issues in dispute. Thus, unlike the situation in *Massoni*, the issue here is strictly a question of law.

Moreover, a later New York appellate division case cites with approval two of the leading cases expressing the *majority* view. In *Schuler-Haas Electric Corp. v. Aetna Casualty and Surety Co.*, 371 N.Y.S. 2d 207, 49 A.D. 2d 60 (1975), the court stated:

> No New York appellate case has been brought to our attention bearing directly on this issue, but a number of courts in other jurisdictions have dealt with this question. These courts have recognized that as a practical matter, the suppliers and small contractors on large construction projects need reasonably prompt payment for their work and materials in order for them to remain solvent and stay in business. In the absence of a clear expression in the contract papers that the credit risk of the general contractor and the delay in payment frequently attending on constructions projects are meant to be shifted to such suppliers and subcontractors, the contract instruments should not be construed as intending such assumption (*Thos. J. Dyer Co. v. Bishop Intern. Engineering Co.*, 303 F.2d 655 [6th Cir. 1962]). Indeed, it is presumed that the parties did not intend that payment of the small subcontractors should await the determination of an extended legal dispute between the owner and general contractor over an issue not concerning him or his work (*Eastern Heavy Constructors v. Fox*, 231 Md. 15, 19-20, 188 A.2d 286 [1963]). 371 N.Y.S. 2d at 210.

The court in *Schuler-Haas* went on to hold that similar language in a payment bond also merely established a time for payment and did not constitute a condition precedent. *Id*. at 211-12.

Similarly, *Zulla Steel, Inc. v. A & M Gregos, Inc.*, 174 N.J. Super. 124, 415 A.2d 1183 (App. Div. 1980), cited as showing that New Jersey is a minority view state, does not so hold. In *Zulla*, the contract provided that the subcontractor would be paid 90% of the value of the work completed and approved by the owner and/or the general

contractor and that such payments would be made on or about the fifteenth day of each succeeding month. The contract further provided that the retainage (10%) would be paid thirty days after completion and acceptance of the captioned job and receipt of final payment therefor by the general contractor.

The subcontractor commenced performance but discontinued its work when it was not paid the progress payments called for in its contract with the general contractor. It then sued the general contractor for the progress payments. The general contractor defended on the ground, *inter alia,* that it was not obligated to pay the subcontractor until it, the general contractor, was paid by the owner. The trial judge rejected that argument. In affirming, the appellate court noted that there was no provision in the contract between the general contractor and the subcontractor allowing the general contractor to defer progress payments to the subcontractor until payments were received from the owner:

> Defendant's argument that the trial judge improperly rejected evidence of a trade custom that permitted it to defer paying plaintiff until the [owner] paid defendant lacks merit. Whatever may have been the trade custom, the contract between the plaintiff and defendant was clear and unambiguous . . . . If we read into the contract a provision that defendant could defer payment until it was paid, we would improperly be writing a new contract for the parties. 415 A.2d at 1187 (citations omitted).

The court then added:

> Further, since the payment provision did defer payment of the retained percentage to plaintiff until defendant received final payment from the [owner], an intent that such deferment apply to the installments is plainly negated. *Id.*

It is this last sentence which is cited as authority for the proposition that New Jersey has adopted the minority

view; that is, that the contract language "*did* defer payment of the retained percentage to plaintiff until defendant received final payment from the [owner] . . . ." *Id.* (emphasis added). It must be remembered, however, that the subcontractor only sued for progress payments, not the retainage. 415 A.2d at 1185. Thus, the court's language concerning the retainage is mere dictum; it does not constitute a holding of the court. Moreover, this court agrees with the court in *Seal Tite Corp. v. Ehret, Inc.*, 589 F. Supp. 701 (D. N.J. 1984), which, after citing the portion of *Zulla* set out above, made the following observation:

> While it is possible to read this language as an acknowledgment that the retained percentage portion need not have been paid unless and until payment was received from the owner, it is equally likely that had the court addressed the issue of the owner's insolvency -- which it did not -- it would have held that this same language merely set a reasonable time frame for payment. [The contractor's] broad reading of the case is contrary to the meaning of *Zulla* taken as a whole. It is clear that *Zulla* articulates a policy of protecting the subcontractor, recognizing the unique vulnerability of one in such a position. The court found it "impossible to believe that in a major construction project, the parties would expect that a subcontractor would continue working even though there were material delays in payment to it." *Id.* at 131, 415 A.2d 1183.
>
> The court further acknowledged that the public policy of New Jersey provides great protection to subcontractors through the Mechanics Lien Act . . . . Taking *Zulla* in its entirety and considering the distinctions of its facts from the present case, I cannot accept [the contractor's] interpretation of the language quoted above to conclude that New Jersey law would require that judgment in favor of [the subcontractor] be denied. Rather, in view of New Jersey's protective policy toward the subcontractor, it is more appropriate to follow the

Sixth Circuit's well-reasoned analysis and interpretation of a "pay when paid" clause. 589 F. Supp. at 705 (citation to statute omitted).[1]

*Standard Asbestos Mfg. Co. v. Kaiser*, 316 Ill. App. 441, 45 N.E.2d 75 (1942), supposedly indicating Illinois' adoption of the minority view, is published as an abstract only. Thus, it is impossible to determine the basis for the publisher's headnote which says "[p]rovisions in subcontractors that subcontractor shall not be entitled to payment until contractor has secured his compensation from the owner are valid and enforceable . . . ." Indeed, it is quite possible that the contract in that case contained specific language which would remove it from the analysis in which this court is presently engaged.

This leaves Georgia as the only state, at least as far as this court's research can determine, with a clear holding that the language at issue here does create a condition precedent. In *Peacock Construction Company v. West*, 111 Ga. App. 604, 142 S.E.2d 332 (1965), the Georgia Court of Appeals considered a contract which contained the following provision:

> Final payment shall be made within 30 days after the completion of the work included in this subcontract, written acceptance by the Architect, and full payment therefor by the Owner.

After holding that the subcontractor's suit against the contractor was defective because of the subcontractor's failure to allege written acceptance by the architect, the court continued:

---

[1] The Sixth Circuit's analysis will be discussed infra.

It is also interesting to note that even though the subcontractor in Zulla sued only for its progress payments, it was awarded judgment for all of its work, including the retainage. 415 A.2d at 1188. It is not clear from the court's opinion, however, whether the contractor had been paid by the owner, the court noting only that since the contractor breached the contract by not making progress payments, it was not necessary for the subcontractor to prove that the contractor had received final payment from the owner. Id.

In addition, the contract is open to the construction that possibility of the owner's nonpayment on account of plaintiff's work in the construction is the subcontractor's risk rather than that of the prime contractor and that the owner's payment to the prime contractor for the subcontractor's work is yet another condition precedent to defendants' liability, so that the plaintiff's failure to allege the owner's payment to the prime contractor renders his petition further defective. 142 S.E.2d at 334.

The court offers no analysis of, or justification for, its holding. It simply concludes that such a contract provision is a condition precedent to payment. As already noted, it apparently represents the only state that so holds.

By contrast, the cases adopting the majority view are substantial in number and analytically persuasive. In fact, this court will borrow a tactic employed by the court in *Seal Tite Corp. v. Ehret, Inc., supra*, and instead of attempting to set out my own analysis of the issue, simply quote at length from the Sixth Circuit case of *Thos. J. Dyer Co. v. Bishop International Engineering Co.*, 303 F.2d 655 (6th Cir. 1962):

It is, of course, basic in the construction business for the general contractor on a construction project of any magnitude to expect to be paid in full by the owner for the labor and material he puts into the project. He would not remain long in business unless such was his intention and such intention was accomplished. That is a fundamental concept of doing business with another. The solvency of the owner is a credit risk necessarily incurred by the general contractor, but various legal and contractual provisions, such as mechanics' liens and installment payments, are used to reduce this to a minimum. These evidence the intention of the parties that the contractor be paid even though the owner may ultimately become insolvent. This

expectation and intention of being paid is even more pronounced in the case of a subcontractor whose contract is with the general contractor, not with the owner. In addition to his mechanic's lien, he is primarily interested in the solvency of the general contractor with whom he has contracted. He looks to him for payment. Normally and legally, the insolvency of the owner will not defeat the claim of the subcontractor against the general contractor. Accordingly, in order to transfer this normal credit risk incurred by the general contractor to the subcontractor, the contract between the general contractor and subcontractor should contain an express condition clearly showing that to be the intention of the parties . . . .

In the case before us, we see no reason why the usual credit risk of the owner's insolvency assumed by the general contractor should be transferred from the general contractor to the subcontractor. It seems clear to us under the facts of this case that it was the intention of the parties that the subcontractor would be paid by the general contractor for the labor and materials put into the project. We believe that to be the normal construction of the relationship between the parties. If such was not the intention of the parties, it could have been so expressed in unequivocal terms dealing with the possible insolvency of the owner . . . . Paragraph 3 of the subcontract does not refer to the possible insolvency of the owner. On the other hand, it deals with the amount, time, and method of payment, which are essential provisions in every construction contract, without regard to possible insolvency. In our opinion, paragraph 3 of the subcontract is a reasonable provision designed to postpone payment for a reasonable period of time after the work was completed, during which the general contractor would be afforded the opportunity of procuring from the owner the funds necessary to pay the subcontractor . . . . To construe it as requiring

the subcontractor to wait to be paid for an indefinite period of time until the general contractor has been paid by the owner, which may never occur, is to give to it an unreasonable construction which the parties did not intend at the time the subcontract was entered into. 303 F.2d 660-61.[2]

Because this court agrees with the rationale and holding of *Dyer*, and because I can add nothing to the persuasive language just quoted, I will simply adopt *Dyer's* reasoning and adopt the majority view.

Turning now to defendant's second argument, defendant asserts that even if Virginia is a majority view state, the parties in the case at bar have manifested their intent that payment by the owner to the general contractor be a condition precedent to the general contractor's payment to the subcontractor. This intent is shown, according to the contractor, by language which the parties added to a different article of the contract.

The contract between the parties is printed. As stated at the beginning of this opinion, Article VI deals with final payment to the subcontractor and contains the provision that "[t]he Contractor shall make final payment to the Subcontractor within ten days of receipt of final

---

[2] See also Seal Tite Corp. v. Ehret, Inc., *supra*; Statesville Roofing & Heating Co., Inc. v. Duncan, 702 F. Supp. 118 (W.D. N.C. 1988); Peacock Const. Co. v. Modern Air Conditioning, Inc., 353 So. 2d 840 (Fla. 1977); Schuler-Haas Electric Corp. v. Aetna Casualty and Surety Co., 371 N.Y.S. 2d 207, 49 A.D. 2d 60 (1975); A. J. Wolfe Company v. Baltimore Contractors, Inc., 244 N.E. 2d 717 (Mass. 1969); Fishman Construction Co. v. Hansen, 238 Md. 418, 209 A.2d 605 (1965); Darrell T. Stuart Constr. v. J. A. Bridges & Bust-Proof, 2 Ariz. App. 63, 406 P.2d 413 (1965); Mignot v. Parkhill, 391 P.2d 755 (Or. 1964); Byler v. Great American Insurance Company, 395 F.2d 273 (10th Cir. 1968) (interpreting Oklahoma law); Trinity Universal Insurance Company v. Smithwick, 222 F.2d 16 (8th Cir. 1955) (interpreting Arkansas law).

Indeed, as Professor Farnsworth points out, "[a]lmost invariably, courts hold that payment by the owner is merely a convenient means for measuring the time after which the general contractor must pay the subcontractor." Farnsworth on Contracts, vol. II, p. 365 (see also the cases cited at n. 26 on p. 365 of the cited work).

payment from the Owner." Article V of the contract deals with progress payments. It provides that progress payments, less a 10% retainage, will also be paid to the subcontractor "within 10 days after receipt of the Owner's payment." At the end of Article V, however, the following typewritten language is added:

> If by not any fault of the Subcontractor, payment
> is witheld [*sic*] by the owner, the Subcontractor
> can demand payment for work completed.

The contractor argues that since this additional language was not also added to Article VI, the parties intended that the subcontractor *not* be able to demand *final* payment until the owner pays the contractor. While this argument is certainly logical and reasonable, the court holds that it is not persuasive.

As far as the court has been able to determine, and counsel for the parties agreed at oral argument, all of the cases in which courts followed the majority view involved claims by subcontractors for final payment under their contracts. None of those cases dealt with progress or periodic payments. Thus, while defendant's explanation is plausible, it is just as likely that while the parties to this contract were satisfied that the majority view would take care of Article VI dealing with the subcontractor's *final* payment, they were unsure what effect the owner's nonpayment of progress payments to the general contractor might have on the general contractor's obligation to make progress payments to the subcontractor. Consequently, they added the typewritten language to Article V to insure that the majority view would apply to progress payments as well. In any event, the holding of *Dyer*, which this court adopts, that parties wishing to provide for payment to a subcontractor other than as results under the majority rule must do so "in unequivocal terms" (303 F.2d at 61), renders the language added to Article V meaningless in interpreting the payment provision of Article VI. Having failed to specifically and unequivocally change the payment provision of Article VI to require payment from the owner before payment can be demanded from the general contractor, the subcontractor is entitled to payment now.